UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

| | |
|---|---|
| SHEILA CARTER | CIVIL ACTION NO. 1:15-CV-02850 |
| VERSUS | JUDGE TRIMBLE |
| U.S. COMMISSIONER OF SOCIAL SECURITY | MAGISTRATE JUDGE PEREZ-MONTES |

REPORT AND RECOMMENDATION

I. Background

Sheila Carter ("Carter") filed applications for social security disability insurance benefits ("DIB") and supplemental security income ("SSI") on April 7, 2014, alleging a disability onset date of October 31, 2013 (Doc. 9, pp. 134, 140). Carter contends she is disabled due to "physical and mental" conditions from "previous strokes and falls," arthritis in her knees due to workplace injuries, inability to remember procedures for work, hearing loss that makes it difficult to understand instructions, and an esophageal hernia that makes it difficult to lift anything (Doc. 9, p. 173). Those claims were denied by the Social Security Administration ("SSA") (Doc. 9, p. 77).

A de novo hearing was held before an Administrative Law Judge ("ALJ") at which Carter appeared with her non-attorney representative and a vocational expert ("VE") (Doc. 9, p. 26). The ALJ found that Carter suffers from severe impairments of obesity, vision impairment, and osteoarthritis of the left knee (Doc. 9, p. 15). The ALJ further found that Carter has the residual functional capacity to perform light

work, except that she cannot climb ladders/ropes/scaffolds, cannot frequently climb ramps/stairs, cannot kneel or crawl, and cannot be exposed to hazards such as unprotected heights and moving machinery, but she can balance, stoop, and crouch (Doc. 9, p. 16).  The ALJ concluded that Carter can perform her past relevant work as a fast food worker and a housekeeper and, therefore, was not disabled at any time though the date of his decision on May 29, 2015 (Doc. 9, pp. 19-20).

Carter requested a review of the ALJ's decision, but the Appeals Council declined to review it (Doc. 9, p. 5).  The ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner").

Carter next filed this appeal for judicial review of the Commissioner's final decision.  Carter raises the following issues (Doc. 10):

1. The ALJ erred when he failed to rule on objections to the VE's testimony.

2. The ALJ's step-4 finding, that Carter was able to return to her past relevant work, is not supported by substantial evidence.

The Commissioner filed a brief in opposition to Carter's appeal (Doc. 11), to which Carter replied (Doc. 12).  Carter's appeal is now before the Court for disposition.

II. **Administrative Transcript**

A. **Medical Records**

Carter was injured while working at the Dollar General store, and was diagnosed with a knee contusion and lumbosacral sprain (Doc 9, pp. 334, 337).  Carter had physical therapy for pain and weakness in her left knee and hip (Doc. 9, pp. 335-

38). Carter was released to return to sedentary work with no squatting or climbing (Doc. 9, p. 340).

On March 20, 2014, Carter went to the emergency room with complaints of dizziness, lightheadedness, near fainting, and chest pain (Doc. 9, p. 272). Carter was diagnosed with vertigo and chest pain, but she left before completion of the recommended tests (Doc. 9, p. 276).

On March 22, 2014, Carter returned to the emergency room for pre-syncope (Doc. 9, p. 266). Carter did not have congestive heart failure (Doc. 9, pp. 391-97), but a small lung nodule was noted in her chest x-ray (Doc. 9, p. 266). A CT scan revealed a benign, calcified nodule, mild emphysema, and cholelithiasis (gallstones) (Doc. 9, p. 268). Carter admitted smoking daily, denied coughing or shortness of breath, and complained of intermittent lightheadedness and generalized weakness (Doc. 9, pp. 266-68). Carter was diagnosed with a calcified lung mass, cholelithiasis, and hypertensive urgency (Doc. 9, p. 269). Carter was referred to a general surgeon for follow-up on the cholelithiasis, which was asymptomatic (Doc. 9, p. 269).

In July 2014, Carter was examined for swollen feet and ankles, shortness of breath, and dizziness (Doc. 9, p. 399). Carter was diagnosed with edema and peripheral venous insufficiency, and prescribed compression stockings (Doc. 9, pp. 403-404).

In November 2014, Carter had an eye examination that revealed bilateral transient vision loss, bilateral dermatochalasis, hyperopia, astigmatism, and presbyopia (Doc. 9, p. 213). Carter was given a new eyeglass prescription, and

referred to a retina specialist (Doc. 9, p. 213). Carter also had cataracts (Doc. 9, p. 353).

Carter went to the Family Health Center in February 2015 because she had fallen (Doc. 305). Carter was diagnosed with essential hypertension and mood disorder (Doc. 9, p. 306).

In March 2015, Carter was diagnosed with subclinical hypothyroidism, essential hypertension, knee pain, and mood disorder at the Family Health Clinic (Doc. 9, pp. 294, 301, 372-73). Carter was referred for an orthopedic consult (Doc. 9, p. 294). It was noted that Carter's history of bipolar disorder was questionable, but that she had related that schizophrenia and other mental illnesses run in her family (Doc. 9, p. 301). Carter also reported that she no longer smokes (Doc 9, p. 301). Carter had edema in both lower legs, knee joint tenderness, a normal gait, and normal sensation (Doc. 9, p. 203). Carter was prescribed a synthoid for her hypothyroidism and medication for her hypertension (Doc. 9, p. 303). Carter was not able to have a psychiatric consult because she did not have a current identification card (Doc. 9, p. 303). Carter was also referred to a gastroenterologist for gastroesophageal reflux disease ("GERD") (Doc. 9, p. 360).

Carter was examined for GERD in March 2015. She complained of heartburn for several years with a lot of reflux (Doc. 9, p. 363). Carter admitted she sometimes induces vomiting to get rid of the burning sensation/acid, which occurs mid-chest and epigastric (Doc. 9, p. 363). It was also noted that Carter had screened positive for severe anxiety, depression, and PTSD (Doc. 9, p. 364). Carter weighed 307 pounds

(Doc. 9, p. 363). Carter had leg edema and knee joint tenderness, but it was difficult to examine her knees because of her discomfort (Doc. 9, p. 364). Carter was prescribed omeprazole for GERD, HCTZ for hypertension, and levothyroxine for her subclinical hypothyroidism (Doc. 9, p. 365). The DASH diet and exercise were recommended for her hypertension (Doc. 9, p. 365).

In a follow-up visit, Carter was reminded to avoid foods that may trigger her GERD, and advised to work on weight loss and low impact exercise for both her knee pain and her hypertension (Doc. 9, p. 459).

In June 2016, Carter was evaluated by Dr. Andriette M. Fitch for the state disability determination service (Doc. 9, p. 284). Carter alleged memory problems, a stroke, falls, arthritis in her knees, hearing loss, and a hernia (Doc. 9, p. 284). Carter said she had TIAs (transient ischemic attacks) that began at age 31 (Doc. 9, p. 284). Carter alleges she suffered memory loss and numbness on the left side of her face, both of which "come and go" (Doc. 9, p. 284). Carter admits she is not seeing a doctor for these symptoms. Dr. Fitch did not find any loss of function in ranges of motion or any effects on Carter's daily living (Doc. 9, pp. 285-86).

Carter also alleged hearing loss since she was a little girl, caused by several ear infections. Carter admitted she does not see an ENT and has never had a hearing screen performed, but contends she has failed job physicals (Doc. 9, p. 284). Dr. Fitch found Carter was able to hear conversation at a normal tone, and there was no medical evidence as to a decrease in functionality due to hearing loss (Doc. 9, p. 285).

5

Carter alleged that she has a hernia, but admitted she had not seen a gastroenterologist and has not had an EGD (esophagogastroduodenoscopy) (Doc. 9, p. 284). Carter complained of choking episodes when she eats certain foods, stating the food "gets stuck" (Doc. 9, p. 284). Dr. Fitch noted that Carter had never been diagnosed with a hernia, weighed 288 pounds, was 65 inches tall, and did not appear to have any problems with swallowing (Doc. 9, p. 285).

Carter further contended that she falls because she is "off balance" (Doc. 9, p. 284). Carter has episodes where her legs just give out on her and she loses her balance (Doc. 9, p. 284). Carter said she has had arthritis in her knees since 2009 (Doc. 9, p. 284). Carter has had knee x-rays but not an MRI, does not take any medication, and does not see a doctor for her knee pain (Doc. 9, p. 284). Carter complained of sharp pain in both knees that radiates down her legs and is worse when she walks (Doc. 9, p. 284). X-rays showed joint space narrowing in her left knee with crepitus noted, but her range of motion was not decreased (Doc. 9, p. 285). However, Carter would not squat due to subjective pain (Doc. 9, p. 285). Dr. Fitch stated that Carter might have difficulty with lifting heavy weight on her left knee, but could bend and stoop (Doc. 9, p. 285).

### B. Administrative Hearing

At her April 2015 administrative hearing, Carter testified that she was 54 years old, had a GED, and had work experience as a stocker, a warehouse worker, a housekeeper, a cook, and working at McDonald's (Doc. 9, pp. 31-32). Carter has not

worked since her disability onset date of October 31, 2013 (Doc. 9, p. 32). Carter is 5'5" tall and weighed 307 pounds (Doc. 9, pp. 33-34).

Carter testified that she can no longer work because of workplace injuries she has sustained–slips, trips, and falls, each causing more harm to her knees (Doc. 9, p. 32). Carter's knees hurt, pop, and cause her to fall down without warning (Doc. 9, p. 32). Carter has injured her left hip in falls (Doc. 9, pp. 35-36). Pain in her left hip makes it difficult to sit for a long period of time (Doc. 9, p. 32). Carter has to alternate between sitting and standing, and she has pain either way (Doc. 9, pp. 32, 35). Her knees hurt almost all the time (Doc. 9, p. 33). Carter falls down once or twice daily (Doc. 9, p. 33). Carter can sit for about 15 minutes before she has to stand because her knees start to ache while she is sitting, and her hip hurts (Doc. 9, p. 35). Carter can walk about half a block before she has to stop (Doc. 9, p. 36). Carter testified that she walks every day to try to lose weight (Doc. 9, p .36). No doctor has prescribed a cane or walker for her (Doc. 9, p. 37).

Carter also testified that she cannot lift very heavy things because she might drop them (Doc. 9, pp. 32-33). Lifting anything over about five pounds causes pain to radiate over her hips and knees (Doc. 9, pp. 33, 34). She cannot lift anything over five pounds because of weakness in her arms (Doc. 9, p. 34). Arthritis in her finger joints causes weakness in her arms (Doc. 9, p. 34). About eight years ago, a doctor told Carter she has arthritis in her fingers (Doc. 9, p. 35).

Carter testified that she lives with her daughter, son-in-law, and three grandchildren (Doc. 9, p. 33). Her son-in-law works, but her daughter does not (Doc. 9, p. 33).

Carter testified that, on a typical day, she cannot always get up in the morning because her knees will not hold her (Doc. 34). She stretches in the morning when she gets up, which seems to help (Doc. 9, p. 33). Carter has had strokes in the past, which have affected her memory and made the left side of her body a little weaker than the right side (Doc. 9, p. 41). Some days, Carter has to have help getting up and down from bed or a chair, especially if she has to get up and go to the bathroom quickly (Doc. 9, p. 43). In addition, Carter often misunderstands what people say due to hearing loss (Doc. 9, p. 43).

Carter testified that she saw Dr. Robert K. Rush in February 2013, and he sent her to physical therapy (Doc. 9, p. 37). Carter went to physical therapy two or three times for the pain and weakness in her left knee and left hip (Doc. 9, pp. 37-38). Dr. Rush released Carter to full duty work in March 2013 at her request (Doc. 9, p. 38). Carter explained that she needs to work to support herself and her 14-year-old son, and she told Dr. Rush that she could wear a knee brace at work (Doc. 9, p. 38). Carter resumed working about 20 hours per week (Doc. 9, p. 38). Carter testified that it was more difficult to work, and that her left leg dragged (Doc. 9, p. 39). Carter admitted that Dr. Rush told her that weight loss would help with her knee pain (Doc. 9, p. 39). Carter is trying to lose weight (Doc. 0, pp. 39-40).

Carter further testified that she has venous insufficiency in her legs, so she has to be careful with salt, or her feet, legs, and ankles will swell to triple their normal size (from her feet to above her knees) (Doc. 9, p. 40). Carter has a little bit of swelling in her legs every couple of days (Doc. 9, p. 40). Carter's diuretics (for hypertension) help control the swelling in her legs (Doc 9, p. 41).

Carter testified that she was diagnosed with an underactive thyroid in July 2014, and takes thyroxizine for that (Doc. 9, p. 42).

Carter testified that she has pain when she eats (Doc. 9, p. 44). Two or three times a week, her food gets "stuck" in the area around her heart and hurts badly (Doc. 9, p. 44). Throwing up gives Carter some relief (Doc. 9, p. 44).

The VE testified that Carter has had past work as a fast-food worker (DOT 311.472-010, light, unskilled, SPV 2); stock clerk (DOT 222.387-058, heavy, semi-skilled, SVP 4); warehouse worker (DOT 922.687-058, medium, unskilled, SVP 2); housekeeper (DOT 323.687-014, light, unskilled, SVP 2); and cafeteria cook (DOT 313.381-030, medium, skilled, SVP 6) (Doc. 9, pp. 45-46).

The ALJ posed a hypothetical involving light work; occasional climbing of ladders, ropes, and scaffolds; frequent climbing of ramps and stairs; unlimited balancing, stooping, kneeling, crouching, and crawling; and avoiding all hazards such as unprotected heights and moving machinery (Doc. 9, p. 46). The VE testified that such a person could work as a housekeeper or a fast-food worker (Doc. 9, p. 46).

The ALJ posed a second hypothetical involving light work; no climbing of ladders, ropes or scaffolds; frequent climbing (ramps and stairs), kneeling, and

crawling; unlimited balancing, stooping, and crouching; and avoiding all hazards such as unprotected heights or moving machinery (Doc 9, pp. 46-47). The ALJ testified that such a person could work as a fast-food worker or a housekeeper (Doc. 9, p. 47).

Carter's representative posed a hypothetical involving light work; no climbing of ladders, ropes, or scaffolds; occasional climbing (ramps and stairs), kneeling, and crawling; occasional balancing, stooping, and crouching; and avoiding all hazards such as unprotected heights or moving machinery (Doc 9, pp. 46-47). The VE testified that a person could work as a fast-food worker or a housekeeper (Doc. 9, p. 47).

Carter's representative posed a second hypothetical involving light work; no climbing of ladders, ropes, or scaffolds; occasional climbing (ramps and stairs), kneeling, and crawling; occasional balancing, stooping, and crouching; avoid all hazards such as unprotected heights or moving machinery; and would require breaks every thirty minutes, in order to walk around (away from the work station) for three to five minutes, due to knee and hip problems (Doc 9, pp. 46-47). The VE testified that such a person would not be able to maintain employment without a modification from the employer (Doc. 9, p. 48).

Carter's representative posed a third hypothetical that was the same as her first one, except that the individual would miss one to two days of work per month (Doc. 9, pp. 48-49). The VE testified that such a person would not be able to maintain employment due to missing work more than one day per month (Doc. 9, p. 49).

C. <u>ALJ's Findings</u>

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a). The sequential process required the ALJ to determine whether Carter (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work she did in the past; and (5) can perform any other type of work. If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. See <u>Greenspan v. Shalala</u>, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 914 U.S. 1120 (1995) (citing <u>Lovelace v. Bowen</u>, 813 F.2d 55, 58 (5th Cir.1987)).

To be entitled to benefits, an applicant bears the initial burden of showing that she is disabled. Under the regulations, this means that the claimant bears the burden of proof on the first four steps of the sequential analysis. Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy. See <u>Greenspan</u>, 38 F.3d at 237.

In the case at bar, the ALJ found Carter last worked on October 31, 2013 (Doc. 9, p. 16). The ALJ also found that Carter has severe impairments of obesity, vision impairment, and osteoarthritis of the left knee (Doc. 9, p. 11), but does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1 (Doc. 9, p. 16). The ALJ then found that, as of May 29, 2015, Carter

was still able to perform her past relevant work as a fast-food worker and a housekeeper (Doc. 9, p. 20). The sequential analysis thus ended with a finding that Carter was not disabled (Doc. 9, p. 19).

### III.  Law and Analysis

#### A.  Scope of Review

In considering Social Security appeals, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors. See McQueen v. Apfel, 168 F.3d 152, 157 (5th Cir. 1999). For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance. See Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971)). Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence, which support the Commissioner's decision, but must include a scrutiny of the record as a whole. The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight. See Singletary v. Bowen, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder. See Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987); Dellolio v. Heckler, 705 F.2d 123, 125 (5th Cir. 1983). The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court. See Allen v. Schweiker, 642

F.2d 799, 801 (5th Cir. 1981); see also Anthony v. Sullivan, 954 F.2d 289, 295 (5th Cir. 1992).  The court does have authority, however, to set aside factual findings that are not supported by substantial evidence and to correct errors of law.  See Dellolio, 705 F.2d at 125.  However, to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence."  See Johnson v. Bowen, 864 F.2d 340 (5th Cir. 1988); Dellolio, 705 F.2d at 125.

B.   The ALJ did not err in finding that Carter is not disabled.

Carter contends the ALJ erred when he failed to rule on her objections to the vocational expert's testimony.  Specifically, Carter argues that she objected, in a post-hearing memorandum, to the VE's testimony regarding Carter's past relevant work, and the ALJ failed to obtain clarification from the VE.  Carter also contends that ALJ erred in concluding she can return to her past relevant work.

The Social Security hearing procedures do not specifically provide for a post-hearing brief.  See 20 C.F.R. §§ 404.944, et seq.  Carter's representative did not request time to file a post-hearing brief, no time was allotted, and the ALJ closed the hearing (Doc. 9, p. 49).  Carter's hearing was on April 20, 2015 (Doc. 9, p. 26), and her post-hearing brief, dated April 30, 2015 (Doc. 9, p. 255), was filed into the administrative record.[1]  The ALJ's decision is dated May 29, 2015 and does not mention Carter's post-hearing brief (Doc. 9, p. 20).

---

[1] Neither the Code of Federal Regulations nor HALLEX (the SSA Hearings, Appeals, and Litigation Law Manual) specifically provide for post-hearing briefs, although they do provide for pre-hearing briefs.  See 20 C.F.R. § 404.949, 416.1449; HALLEX I-2-6-76, "Arguments by the Claimant or Appointed Representative," 1993 WL 751903 (updated 10/14/16).

13

Carter contends her work as a housekeeper was not past relevant work because it was performed more than fifteen years ago and, in 1999, she made less than $3,000. Carter did not object to the VE's testimony at the hearing. Moreover, Carter specifically testified at her administrative hearing that she had worked as a housekeeper within the last fifteen years (Doc. 9, p. 32). Carter now argues that she worked as a housekeeper at a Motel 6 in 1999 and that she only earned $2,929.08.

Past relevant work is work a claimant has done within the past 15 years, that was substantial gainful activity, and that lasted long enough for the claimant to learn to do it. 20 C.F.R. § 404.1560(b)(1). Substantial gainful activity is defined in 20 C.F.R. § 404.1510: "Substantial gainful activity means work that - (a) Involves doing significant and productive physical or mental duties; and (b) Is done (or intended) for pay or profit." Substantial gainful activity is further defined in 20 C.F.R. § 404.1572: "Substantial gainful activity is work activity that is both substantial and gainful:

> (a) Substantial work activity. Substantial work activity is work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before.
>
> (b) Gainful work activity. Gainful work activity is work activity that you do for pay or profit. Work activity is gainful if it is the kind of work usually done for pay or profit, whether or not a profit is realized.
>
> (c) Some other activities. Generally, we do not consider activities like taking care of yourself, household tasks, hobbies, therapy, school attendance, club activities, or social programs to be substantial gainful activity."

Carter's written description of her past work shows she worked as a housekeeper at Motel 6 and Holiday Inn from 1988-1999 (Doc. 9, p. 182). The VE found that Carter could still work as a housekeeper, both as that work is generally performed in the national economy and as she actually performed that work at her jobs. The VE also testified that the job of housekeeper exists in substantial numbers in both the national and regional economies. Therefore, the VE's testimony shows that Carter can work as a housekeeper, regardless of whether it is characterized as past relevant work or not. Moreover, whether or not Carter earned very much as a housekeeper is not particularly relevant, since she does not dispute that she held that job in order to earn money.

Carter also wrote in her work description that she worked as a "fast food cook" from 2001-2007 (Doc. 9, p. 182). At one fast food place, Carter she cooked pizza, served a hot buffet, and cleaned the kitchen at the end of her shift (Doc. 9, p. 188). At a different fast food place, Carter cooked the breakfast and supper menu foods, assembled customers' orders, replenished foods, and restocked French fries and hamburger patties (Doc. 9, p. 187).

A "fast foods worker" is described in DOT 311.472-010:

> Serves customer of fast food restaurant: Requests customer order and depresses keys of multicounting machine to simultaneously record order and compute bill. Selects requested food items from serving or storage areas and assembles items on serving tray or in takeout bag. Notifies kitchen personnel of shortages or special orders. Serves cold drinks, using drink-dispensing machine, or frozen milk drinks or desserts, using milkshake or frozen custard machine. Makes and serves hot beverages, using automatic water heater or coffeemaker. Presses lids onto beverages and places beverages on serving tray or in takeout container. Receives payment. May cook or apportion french fries or perform other

15

> minor duties to prepare food, serve customers, or maintain orderly eating or serving areas.

A "fast foods cook" is described in DOT 313.374-010:

> Prepares and cooks to order foods requiring short preparation time: Reads food order slip or receives verbal instructions as to food required by patron, and prepares and cooks food according to instructions. Prepares sandwiches [SANDWICH MAKER (hotel & rest.) 317.664-010]. Prepares salads and slices meats and cheese, using slicing machine, [PANTRY GOODS MAKER (hotel & rest.) 317.684-014]. Cleans work area and food preparation equipment. May prepare beverages [COFFEE MAKER (hotel & rest.) 317.684-010]. May serve meals to patrons over counter.

Carter contends she sometimes lifted up to 30 pounds at one of her fast food jobs. Therefore, "fast foods cook" (a medium level job) is a more appropriate job title than "fast foods worker" (a light level job). However, Carter wrote she only lifted up to 20 pounds at another fast foods job. It appears from Carter's job descriptions that at least one of her past jobs was generally more that of a fast foods worker than a fast foods cook. The VE testified that Carter is able to work as a "fast food worker" both as that job is generally performed and as Carter actually performed it. The VE also testified that the job of fast foods worker exists in substantial numbers in both the national and regional economies. Therefore, the VE's testimony shows that Carter can work as a fast foods worker, regardless of whether it is characterized as past relevant work or not.

Although the ALJ found Carter was not disabled at Step 4 when he found Carter could perform her past relevant work as a housekeeper and fast foods worker, he actually proceeded to Step 5 of the analysis when he posed hypotheticals to the VE and found Carter could work as a housekeeper or a fast foods worker, as those jobs

16

are generally performed. The VE's testimony is substantial evidence that supports the Commissioner's finding that there was work existing in substantial numbers in the national and regional economies that Carter could perform. Therefore, the evidence and the ALJ's findings show that Carter was "not disabled" at Step 5.

Accordingly, Carter has not shown any prejudice arising from the fact that the ALJ did not specifically address the issues as to her past relevant work that were raised in her post-hearing brief.

Finally, Carter contends that, due to her borderline age, the ALJ's "errors" are not harmless and that she is disabled under the "grids." Where the findings of fact made with respect to a particular individual's vocational factors and residual functional capacity coincide with all of the criteria of a particular "rule" of the Medical-Vocational Guidelines found in 20 C.F.R. Pt. 404, Subpt. P, Appendix 2 ("the grids"), the rule directs a conclusion as to whether the individual is or is not disabled. See Sec. 200.00(a) of 20 C.F.R. Pt. 404, Subpt. P, Appendix 2.

As discussed above, the ALJ did not err in concluding Carter was not disabled at any time through May 29, 2015. If and when Carter qualifies for disability under the grids due to a change in her age, she should file a new application for benefits.

## IV.  Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that Carter's appeal be DENIED AND DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), parties aggrieved by this Report and Recommendation have fourteen (14) calendar days from

service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. No other briefs (such as supplemental objections, reply briefs, etc.) may be filed. Providing a courtesy copy of the objection to the undersigned is neither required nor encouraged. Timely objections will be considered by the District Judge before a final ruling.

Failure to file written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation within fourteen (14) days from the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Judge, except upon grounds of plain error.

THUS DONE AND SIGNED in chambers in Alexandria, Louisiana, this __27th__ day of February, 2017.

Joseph H.L. Perez-Montes
United States Magistrate Judge